2016-2197

# United States Court of Appeals for the Federal Circuit

EXMARK MANUFACTURING COMPANY, INC.,

*Plaintiff-Appellee*,

v.

BRIGGS & STRATTON POWER PRODUCTS GROUP, LLC,

*Defendant-Appellant*.

Appeal from the United States District Court for the District of Nebraska in Case No. 8:10-cv-00187-JFB-TDT, Chief Judge Joseph F. Bataillon

**BRIEF OF PLAINTIFF-APPELLEE EXMARK MANUFACTURING COMPANY, INC.**

(NONCONFIDENTIAL – CONFIDENTIAL MATERIAL DELETED)

J. Derek Vandenburgh
Joseph W. Winkels
Alexander S. Rinn
CARLSON, CASPERS, VANDENBURGH, LINDQUIST & SCHUMAN, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone: (612) 436-9600
Facsimile: (612) 436-9605

*Counsel for Plaintiff-Appellee Exmark Manufacturing Company, Inc.*

October 28, 2016

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

EXMARK MANUFACTURING CO. V. BRIGGS & STRATTON
No. 2016-2197

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellee Exmark Manufacturing Company, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:
   Exmark Manufacturing Company, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
   Exmark Manufacturing Company, Inc. is a wholly owned subsidiary of The Toro Company. No person or entity owns 10% or more of the stock of The Toro Company.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court and who have not or will not enter an appearance in this court are:

Matthew J. Goggin
Carlson, Caspers, Vandenburgh,
Lindquist & Schuman, P.A.
225 S. 6th St., Suite 4200
Minneapolis, MN 55402

Jill R. Ackerman
Baird Holm LLP
1700 Farnam Street
Omaha, NE 68102

DATED: October 28, 2016

*/s/ J. Derek Vandenburgh*
J. Derek Vandenburgh

# TABLE OF CONTENTS


STATEMENT OF RELATED CASES ....................................................1

COUNTER-STATEMENT OF THE ISSUES ........................................2

PRELIMINARY STATEMENT ........................................................3

COUNTER-STATEMENT OF THE CASE ..........................................4

A. Exmark and Briggs Compete in the Commercial Mower Business .....4

B. The State of the Art Prior to Exmark's Invention ................................5

C. Exmark's Development of the Patented Invention and the Resulting Commercial Success ...........................................................7

D. Exmark's '863 Patent ......................................................................10

E. The Scag Litigation and the First Reexamination..............................13

F. The Present Lawsuit ........................................................................15

1. The Second and Third Reexaminations ...................................18

2. The 2015 Summary Judgment Rulings and Trial .....................19

a. The Trial Evidence of Willful Infringement ..................20

b. The Trial Evidence on Briggs' Modified Design...........22

c. The Trial Evidence Relating to Damages.......................24

3. The Bench Trial on Laches and the Post-Trial Rulings...........25

SUMMARY OF THE ARGUMENT ....................................................27

ARGUMENT ..........................................................................................28

I. Standard of Review.............................................................................28

II. The District Court Properly Granted Summary Judgment of No Invalidity .....29

A. Briggs Failed to Present a Genuine Issue of Material Fact on Alleged Prior Art Invalidity .....29

1. The District Court Correctly Gave Substantial, But Not Dispositive, Weight to the Three Reexaminations .....29

2. No Reasonable Jury Could Find That the Claims Are Anticipated By the Simplicity Mulching Mower .....31

3. No Reasonable Jury Could Find That the Claims Would Have Been Obvious .....35

B. Briggs Failed to Prove That the Claims of the ‘863 Patent Are Indefinite .....37

1. Some Uncertainty in Claim Scope is Both Permitted and Necessary to Protect Inventions Such as This One .....37

2. The Ubiquitous Use of “Substantially” and “Elongated” in Mower Patents Shows That Those Skilled in the Art Consider the Terms to Be Definite .....39

3. The ‘863 Patent Provides Objective Structural and Functional Boundaries on the Scope of the Invention .....40

4. The Testimony From The Technical Experts Confirms That the Claims Are Not Indefinite .....43

III. The District Court Did Not Abuse Its Discretion by Denying Briggs a New Trial on Damages .....45

A. The District Court Did Not Abuse Its Gate Keeping Role in Admitting the Testimony of Exmark’s Damages Expert .....45

1. Using The Mower As The Base Was Appropriate Under The Facts Of This Case .....47

2. Ms. Bennis's Opinion, Including Her Apportionment for Conventional Elements, Was Well Supported By the Evidence ....53

B. The District Court Did Not Abuse Its Discretion In Excluding Certain Prior Art ....59

C. The District Court Did Not Abuse Its Discretion in Limiting Briggs' Arguments Regarding Alleged Delay ....60

IV. Halo Does Not Justify a New Trial on Willful Infringement ....61

V. The District Court Did Not Abuse Its Discretion in Rejecting Briggs' Laches Defense ....65

A. The District Court Did Not Misapply the Law in Concluding That Exmark Did Not Unreasonably Delay in Filing Suit ....65

B. The District Court Did Not Err in Rejecting Briggs' Sole Argument for Material Prejudice ....68

C. Briggs' Failure to Challenge the District Court's Balancing of the Equities is Fatal to Its Request for a Remand ....69

CONCLUSION AND STATEMENT OF RELIEF SOUGHT ....70


**CONFIDENTIAL MATERIAL DELETED:**
The material omitted at pages 15 and 56 describes terms of a confidential settlement agreement subject to the Protective Order entered by the District Court; the material omitted at pages 17, 52, 56, 57 and 58 describes confidential sales, profit and customer information of the parties subject to the Protective Order entered by the District Court.

# TABLE OF AUTHORITIES

## Cases

A. C. Aukerman Co. v. R. L. Chaides Constr. Co.,
960 F.2d 1020 (Fed. Cir. 1992) .......... 65, 66, 68

Abbott Labs. v. Sandoz, Inc.,
544 F.3d 1341 (Fed. Cir. 2008) .......... 36

Andrew Corp. v. Gabriel Elecs., Inc.,
847 F.2d 819 (Fed. Cir. 1988) .......... 39

Astrazeneca AB v. Apotex Corp.,
782 F.3d 1324 (Fed. Cir. 2015) .......... 46, 47, 50, 53

Barrett v. Rhodia, Inc.,
606 F.3d 975 (8th Cir. 2010) .......... 29

Biosig Instruments, Inc. v. Nautilus, Inc.,
783 F.3d 1374 (Fed. Cir. 2015) .......... 39

Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.,
807 F.3d 1283 (Fed. Cir. 2015) .......... 69

Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.,
809 F.3d 1295 (Fed. Cir. 2015) .......... 46, 48, 51, 54

Cox Communs., Inc. v. Sprint Commun. Co.,
No. 2016-1013, 2016 U.S. App. LEXIS 17372 (Fed. Cir. Sept. 23, 2016) .. 38, 42

Creative Compounds, LLC v. Starmark Labs.,
651 F.3d 1303 (Fed. Cir. 2011) .......... 35

DDR Holdings, LLC v. Hotels.com, L.P.,
773 F.3d 1245 (Fed. Cir. 2014) .......... 40

Deere & Co. v. Bush Hog, LLC,
703 F.3d 1349 (Fed. Cir. 2012) .......... 38, 40

Douglas Dynamics, LLC v. Buyers Prods. Co.,
76 F. Supp. 3d 806 (W.D. Wis. 2014),
aff'd, 628 Fed App'x 767 (Fed. Cir. 2016) .......................................................50

Ecolab, Inc. v. Envirochem, Inc.,
264 F.3d 1358 (Fed. Cir. 2001) .......................................................................38

Eibel Process Co. v. Minn. & Ont. Paper Co.,
261 U.S. 45 (1923) .........................................................................................42

Eli Lilly & Co. v. Barr Labs., Inc.,
251 F.3d 955 (Fed. Cir. 2001) .........................................................................29

Enzo Biochem, Inc. v. Applera Corp.,
599 F.3d 1325 (Fed. Cir. 2010) .......................................................................38

Ericsson, Inc. v. D-Link Sys., Inc.,
773 F.3d 1201 (Fed. Cir. 2014) .......................................................................46

Fromson v. Advance Offset Plate, Inc.,
755 F.2d 1549 (Fed. Cir. 1985) .......................................................................30

Fujitsu Ltd. v. Tellabs Operations, Inc.,
821 F. Supp. 2d 1009 (N.D. Ill. 2011) ..............................................................40

Gasser Chair Co. v. Infanti Chair Mfg. Corp.,
60 F.3d 770 (Fed. Cir. 1995) ..................................................................... 65, 69

GE Lighting Solutions, LLC v. Lights of Am., Inc.,
No. 2015-1979 (Fed. Cir., slip op. Oct. 27, 2016) ............................................42

Global Traffic Techs., LLC v. Emtrac Sys., Inc.,
No. 10-4110, 2014 U.S. Dist. LEXIS 57840 (D. Minn. 2014) ..........................69

Halo Elecs., Inc. v. Pulse Elecs., Inc.,
136 S. Ct. 1923 (2016) ............................................................................ passim

Harrison v. Purdy Bros. Trucking Co.,
312 F.3d 346 (8th Cir. 2002) ...........................................................................29

i4i Ltd. P'ship v. Microsoft Corp.,
598 F.3d 831 (Fed. Cir. 2010) ....................................................................58

Innovention Toys, LLC v. MGA Entm't, Inc.,
No. 2014-1731, 2016 U.S. App. LEXIS 14371 (Fed. Cir. Aug. 5, 2016) .... 62, 63

Kinzenbaw v. Case LLC,
179 Fed. App'x 20 (Fed. Cir. 2006)........................................................ 39, 40

Koninklijke Philips v. Zoll Med. Corp.,
No. 2014-1764, 2016 U.S. App. LEXIS 13710 (Fed. Cir. July 28, 2016)...........38

Laser Dynamics, Inc.v. Quanta Computer, Inc.,
694 F.3d 51 (Fed. Cir 2012) ........................................................................50

Lucent Techs., Inc. v. Gateway, Inc.,
580 F.3d 1301 (Fed. Cir. 2009) ..................................................................50

Melford Olsen Honey, Inc. v. Adee,
452 F.3d 956 (8th Cir. 2006) .......................................................................64

Mformation Techs., Inc. v. Research in Motion Ltd.,
764 F.3d 1392 (Fed. Cir. 2014) ..................................................................34

Micro Chem., Inc. v. Lextron, Inc.,
318 F.3d 1119 (Fed. Cir. 2003) ..................................................................54

Nautilus, Inc. v. Biosig Instruments, Inc.,
134 S. Ct. 2120 (2014) ...................................................................... 37, 38, 39

Petrella v. MGM,
134 S. Ct. 1962 (2014) ..............................................................................67

Plas-Pak Indus. v. Sulzer Mixpac AG,
600 Fed. App'x 755 (Fed. Cir. 2015).........................................................35

Read Corp. v. Portec, Inc.,
970 F.2d 816 (Fed. Cir. 1992) ....................................................................61

SCA Hygiene Prods. v. First Quality Baby Prods.,
807 F.3d 1311 (Fed. Cir. 2015) ..................................................................65

Spectralytics, Inc. v. Cordis Corp.,
649 F.3d 1336 (Fed. Cir. 2011) .......................................................................50

SRI Int'l v. Advanced Tech. Lab.,
No. 93-1074, 1994 U.S. App. LEXIS 36220 (Fed. Cir. Dec. 21, 1994) ....... 30, 36

State Contr. & Eng'g Corp. v. Condotte Am., Inc.,
346 F.3d 1057 (Fed. Cir. 2003) .......................................................................50

Stryker Corp. v. Zimmer, Inc.,
No. 2013-1668, 2016 U.S. App. LEXIS 16646 (Fed. Cir. Sept. 12, 2016) .........62

The Toro Co. et al. v. Scag Power Equip., Inc.,
No. 8:01-CV-279, 2003 U.S. Dist. LEXIS 603,
(D. Neb. Jan. 15, 2003)............................................................ 13, 15, 22, 67

Transclean Corp. v. Bridgewood Servs., Inc.,
290 F.3d 1364 (Fed. Cir. 2002) .......................................................................34

Transmatic, Inc. v. Gulton Indus.,
53 F.3d 1270 (Fed. Cir. 1995) .........................................................................30

Tripp v. United States,
406 F.2d 1066 (Ct. Cl. 1969)...........................................................................66

Uniloc USA, Inc. v. Microsoft Corp.,
632 F.3d 1292 (Fed. Cir. 2011) ................................................................. 50, 51

Univ. of Pittsburgh v. Varian Med. Sys., Inc.,
561 Fed. App'x 934 (Fed. Cir. 2014)............................................... 47, 48, 50, 53

Verve v. Crane Cams,
311 F.3d 1116 (Fed. Cir. 2002) .......................................................................38

VirnetX, Inc. v. Cisco Sys., Inc.,
767 F.3d 1308 (Fed. Cir. 2014) .......................................................................50

WBIP, LLC v. Kohler Co.,
829 F.3d 1317 (Fed. Cir. 2016) ................................................................. 63, 64

WesternGeco L.L.C. v. Ion Geophysical Corp.,
No. 2014-1526, 2016 U.S. App. LEXIS 17215 (Fed. Cir. Sept. 21, 2016) .. 62, 63

Wright v. Hoover,
329 F.2d 72 (8th Cir. 1964) ....................................................................28

Yeda Research & Dev. Co. v. ImClone Sys.,
443 F. Supp. 2d 570 (S.D.N.Y. 2006) .........................................................69

**Statutes**

35 U.S.C. § 285 ...........................................................................................62

## STATEMENT OF RELATED CASES

No appeal in or from the present civil action has previously been before this Court or any other appellate court.

There is no case pending in this Court or any other court that will directly affect the Court's decision here.

## COUNTER-STATEMENT OF THE ISSUES

The correct statement of the issues is as follows:

1. Did the district court correctly grant summary judgment of no invalidity where patentability had been confirmed in three prior reexaminations and Briggs' invalidity arguments were based on a claim construction that was held to be overly broad by the Patent Trial and Appeal Board ("PTAB") even under the broadest reasonable interpretation standard?

2. Did Briggs prove by clear and convincing evidence that the claim phrase "elongated and substantially straight baffle portion" makes it impossible to determine the overall scope of the claims with reasonable certainty?

3. Regarding damages, did the district court abuse its discretion by allowing Exmark to apportion for the value of the patented invention relative to conventional elements via the Georgia-Pacific factors and by making other discretionary evidentiary rulings?

4. Is there a reason in this case to deviate from this Court's prior holdings that a jury's finding of subjective willful infringement is sufficient predicate for an award of enhanced damages after Halo Elecs., Inc. v. Pulse Elecs., Inc., 136 S. Ct. 1923 (2016)?

5. Did the district court abuse its discretion in rejecting Briggs' laches defense?

# PRELIMINARY STATEMENT

Briggs did not lose this case because of the district court judge's desire for "expedience" or his "misplaced intuition," as Briggs alleges. The fact that it took six years to get to final judgment shows that this case was far from expedient. The fact that the Addendum to Briggs' brief contains 131 pages of detailed analysis by the district court judge shows that his rulings were not based on mere intuition.

Briggs lost because it deserved to lose. Briggs lost because it copied Exmark's invention so closely that its accused device was nearly identical to the preferred embodiment of Exmark's '863 patent and indisputably infringed. Briggs lost because Exmark's invention was not, as Briggs asserts, a minor improvement over the prior art, but rather was an industry-changing invention that went against the conventional wisdom in the art and provided many competitive advantages at the heart of why landscape contractors buy commercial lawnmowers. Briggs lost because it is a willful infringer who ignored the risk of infringing Exmark's patent even after the head of its commercial mower business learned about the patent.

Under the circumstances, the $50 million judgment against Briggs is unquestionably reasonable. Indeed, the jury's damages award and the district court's enhancement both could have been higher. Briggs' disappointment and disagreement with the results of the trial do not make it unfair. Briggs' attempts to blame the diligence and thoughtfulness of the district court judge are unfounded.

## COUNTER-STATEMENT OF THE CASE

### A. Exmark and Briggs Compete in the Commercial Mower Business

Below are pictures of two common types of commercial lawnmowers at issue in this case:



**Exmark Zero Turn Radius (“ZTR”) Riding Mower**




**Exmark Wide Area Walk Behind**

These are highly engineered and expensive pieces of equipment that, at retail, often cost in excess of $10,000. (Appx17670-17671.) They are primarily used by landscape contractors who cut grass for a living. (Appx17668.) For these customers who use their mowers hundreds of hours per year, the adage “time is money” holds very true. (Appx18011; Appx17678.) Productivity is critical. (Appx17673-17674; Appx18180-18181; Appx18191; Appx18411; Appx18671; Appx18958.) The faster a contractor can cut while maintaining the desired high quality of cut, the more money he or she can make. (Id.)

Exmark mowers are the number one selling brand of commercial lawnmowers in the United States. (Appx17675; Appx17758.) Briggs is a direct competitor that sells commercial mowers under the brands Ferris and Snapper Pro. (Appx17675; Appx18188.)

## B. The State of the Art Prior to Exmark's Invention

The mowers at issue in this case are three-bladed side discharge mowers. Below is a demonstrative showing the underside of a typical side discharge mower deck sold by Exmark, Briggs, and others prior to the invention of Exmark '863 patent:




This demonstrative shows a deck housing having front, rear and side walls, and a discharge opening located in one of the side walls. A rear baffle is located behind the three cutting blades to help direct air and grass clippings.

In this typical prior art design, the space between the blades and the front wall was left open. (Appx17711-17712; Appx18113; Appx21581; see Appx13048-13049; Appx10010-10011.) This reflected the conventional wisdom at the time. (Id.) A three-bladed side discharge mower not only needs to cut a wide swath of grass evenly, it needs to transport the grass clippings sideways from the closed side across the entire width of the deck and out the side discharge, disbursing those clippings evenly over the lawn surface. The conventional wisdom held that the best way to do so was to maintain open space in front of the blades so that grass clippings could flow across the deck in front of the path of the downstream cutting blades. (Id.)

Consistent with this conventional wisdom, only ***two*** prior art references have been identified that show any sort of front baffle structure in a side discharge mower. These two prior art references ("Walker" and "Kidd") show baffles that were much different from those of Exmark's '863 patent and have been considered multiple times by the PTO during examination and reexamination of the '863 patent. (Appx21753; Appx5947; see also Appx234; Appx243-247; Appx5603-5605; Appx5657-5662; Appx5965.)

In an effort to make it appear as if the invention of the '863 patent was not a substantial departure from the prior art, Briggs' brief shows numerous examples of prior art mulching mowers. Mulching is fundamentally different from side

discharge mowing. (Appx239; Appx13049-13051; Appx17712.) Unlike side discharge mowers, mulching mowers are not designed to transport grass clippings across multiple cutting chambers and out a side discharge opening. Instead, they confine grass clippings under the cutting deck (typically within the same blade chamber) so that the clippings are re-cut multiple times into smaller pieces that ultimately fall down in the turf underneath the mower. (Id.) Mulching mowers commonly employed baffles both behind and in front of the blades in order to confine the clippings. (Id.)

It was also common in the prior art to temporarily convert a side discharge mower into a mulching mower through installation of a "mulch kit." (Id.) A typical mulch kit included a plate for closing the side discharge opening, together with front baffle(s) that helped confine the air and grass cuttings around each blade. (Id.; Appx13086.) In accordance with the conventional wisdom, when it was desired to return to side discharge mowing, the mulch kit would be removed, leaving no structure between the blades and the front deck wall. (Appx13048-13051; Appx13086.)

### C. Exmark's Development of the Patented Invention and the Resulting Commercial Success

In the early 1990s, Exmark was a small commercial mower manufacturer. (Appx18175-18176.) Its side discharge mowers followed the conventional

wisdom of having no structure between the blades and the front wall of the deck. (Appx17708-17711; Appx21581.)

In 1994, Exmark set out to develop a mid-mount ZTR mower that would cut well at high speeds. (Appx17726.) In the course of that project, Exmark engineer Garry Busboom went against the conventional wisdom by adding a baffle that extended all the way across the front of the mower deck. (Appx232-242; Appx17713-17715.) Mr. Busboom shaped the baffle to include portions that directed grass clippings from one cutting chamber into the blade tip path of the downstream blade. (Id.; Appx17779-17780.) The following demonstrative shows the underside of the deck with the baffle developed by Mr. Busboom:




Mr. Busboom coined them "flow control baffles." (Appx21588.)

In November 1994, a number of Exmark technical employees field tested their prototype ZTR with the flow control baffles. (Appx17724-17729.) There was skepticism among the employees, who expected that the baffle design would reduce the cut quality and cause the mower engine to "bog down" in wet or heavy grass. (Id.; Appx10017; Appx13123-13126.) To their surprise, the opposite occurred: the prototype mower cut and discharged grass better, even at higher speeds, and without bogging down the engine. (Id.)

In 1995, Exmark introduced its new mid-mount ZTR mower, the "Lazer Z." (Appx17734.) The mower was an instant success that revolutionized the industry. (Appx18010-18012; Appx18570.) The mower with the flow control baffles provided a number of advantages:

- Improved cut quality, even at higher speeds;
- Improved discharge quality, with the grass clippings being spread evenly over a larger area and with reduced clumping;
- Reduced "blowout" (an undesirable situation where grass clippings escape under the front wall of the deck);
- Reduced tendency of the engine to bog down in wet and/or heavy cutting conditions; and
- Reduced horsepower demand on the mower engine, allowing for the use of smaller, less expensive engines.

(Appx13123-13126; Appx17715-17716; Appx17725; Appx17729; Appx17731-17734; Appx17737-17740; Appx18113-18119; Appx21450; Appx21588; Appx22640-22641.) These advantages were extremely important to those who mow for a living and were a primary reason Exmark's Lazer Z product was so successful. (Appx112; Appx17673-17674; Appx18010-18014; Appx18180-18184; Appx18411; Appx18958.)

Exmark quickly added the flow control baffles to other mowers. (Appx17736; Appx18186.) Exmark's sales skyrocketed, doubling in two years, and then doubling again in the following two years. (Appx18015-18019; Appx21627.) Exmark went from having a tiny share of the market to being the market leader. (Id.; Appx17675; Appx18015-18019; Appx18569-18570.) Also as a result of the invention, Exmark became viewed as having one of the industry's premier line of mowers that commanded a premium price. (Appx11419; Appx17677; Appx18010-18012.)

### D. Exmark's '863 Patent

The '863 patent discloses both Mr. Busboom's side discharge mower with flow control baffles and a subsequent invention consisting of a mulch kit designed to cooperate with the flow control baffles. (Appx234-241.) Figure 1 shows the overall mower:




(Appx235.) Independent claims 1 and 6 are directed to the side discharge invention with the flow control baffles. (Appx241-242.) Claim 1 recites a "multiblade lawn mower" having a mower deck with walls, means for moving the deck along the ground (i.e., a frame and drive wheel(s)), cutting blades within the deck, and power means for rotating the blades (i.e., an engine). (Appx241.) One of the side walls has a discharge opening. (Id.)

Claim 1 then recites the structure, positioning and function of a first (front) flow control baffle in substantial detail. The baffle is "positioned in said mower deck…between said cutting blades and said front wall" and extends across essentially the entire front of the deck (i.e., "substantially continuously from a first location adjacent the interior surface of said second side wall to a second location adjacent the interior surface of said first side wall"). (Id.) The front baffle has first

and second "arcuate baffle portions" and a first "elongated and substantially straight baffle portion." (Id.) The first and second arcuate baffle portions extend partially around the first and second cutting blades, respectively. (Id.) The elongated and substantially straight baffle portion is located between the two arcuate baffle portions and is "angularly disposed with respect to the said circle defined by the blade tip path of said second cutting blade in a chord-like fashion so that the cuttings from said first cutting blade will be deflected inwardly within the said circle defined by the blade tip path of said second cutting blade." (Id.) These elements are identified in the following annotated drawing of the preferred embodiment:



FIG. 4

(Appx238.) Finally, claim 1 specifies the shape and location of a second (rear) flow control baffle, and states that the front and rear flow control baffles "defin[e]

a plurality of open throat portions which are positioned between adjacent cutting blades." (Appx241.)

Independent claim 6 is similar to claim 1, but requires that the front flow control baffle have a second "elongated and substantially straight baffle portion" oriented "in a chord-like fashion" relative to a third blade. (Appx242.)

### E. The Scag Litigation and the First Reexamination

In 2001, Exmark and its parent company, Toro, brought suit against Scag Power Equipment ("Scag") for infringement of the '863 patent and three other patents. (Appx17758-17759.) At the time, Scag and Exmark were the two largest manufacturers of commercial lawnmowers. (Appx17758.)

Scag did not dispute that its mowers infringed the '863 patent. (Appx20250-20251.) Instead, the primary issue was the validity and enforceability of the claims over a prior art "Walker brochure." See The Toro Co. et al. v. Scag Power Equip., Inc., No. 8:01-CV-279, 2003 U.S. Dist. LEXIS 603, at *8-12 (D. Neb. Jan. 15, 2003). Walker is one of the two prior art references showing a side discharge mower with a front baffle of any sort. (Appx21753.) However, the front baffle, highlighted in red below, was very short:




(Id.).[1] This baffle did not extend "from a first location adjacent the interior surface of said second side wall to a second location adjacent the interior surface of said first side wall," as required by the claims of the '863 patent, nor did it have the claimed "first arcuate baffle portion." (Appx17983-17984; Appx241-242.) Walker also did not have the second "elongated and substantially straight baffle portion" required by independent claim 6. (See Appx242.) Because of these differences, it also did not provide the advantages of Exmark's invention. (Appx13072-13073; Appx18113-18119 (Dr. Strykowski explaining the benefits of

[1] Briggs' brief deceptively mislabels the baffle structure of various prior art mowers, including Walker (Briggs Br. at 8 and 14), Kidd (id. at 24), and Samejima '635 (id. at 25), to make them appear more like Exmark's invention. Briggs' own witnesses admitted at trial that the baffle structure in Walker is limited to the red structure identified above and does not include the entire multicolored structure shown on page 14 of Briggs' brief. (Appx18696.) The remaining structure highlighted in Briggs' brief is part of the deck walls, which are called out as separate structure in the claims of the '863 patent.

a baffle separate from the front wall that extends all the way across the front of the deck with the claimed arcuate and substantially straight baffle portions).)

The case ultimately settled with Scag agreeing to change to a non-infringing design, pay [redacted] for past infringement, and pay a royalty of [redacted] on any excess sales prior to the changeover. (Appx21836-21837.)

Although the Walker reference was submitted to the PTO during the original examination of the '863 patent (Appx232), Exmark filed for reexamination shortly after the conclusion of the Scag litigation to confirm the patentability of the claims over Walker. (Appx5965.) The PTO granted the reexamination and confirmed the patentability of the claims. (Appx243-244.)

### F. The Present Lawsuit

At the time the first reexamination ended in late 2004, Exmark suspected that a number of other companies were infringing the '863 patent. (Appx20269.) Exmark believed that the Scag litigation was well known in the industry and that these potential infringers were aware of their infringement. (Appx20280-20281.) Nonetheless, the Scag litigation had left Exmark very reticent about the time and expense associated with additional enforcement actions. (Appx20253-20254; Appx20270.) The two year litigation consumed valuable time and resources of key Exmark personnel. (Id.) Because Exmark suspected many companies of infringing the '863 patent, Exmark was faced with the prospect of multiple patent

lawsuits to secure its rightful position as the only company selling mowers covered by the '863 patent. (See Appx20270; Appx20386-20387.) The suspected infringers tended to be smaller competitors who were not touting their baffles or quality of cut as a key selling feature. (Appx20270.)

Then Briggs came to the forefront. In 2009, Exmark learned of Briggs' "iCD cutting system" advertising campaign. (Appx20275-20276.) The iCD cutting system campaign trumpeted the high quality of cut provided by Briggs' infringing mowers. (E.g. Appx21842; Appx21844.) Among the features identified as contributing to that high quality of cut were the flow control baffles:



**CONFIDENTIAL INFORMATION DELETED**

(Appx21842.)

Also in 2009, Briggs used its infringing mower design to entice Exmark's largest customer, a large commercial landscape contractor named [redacted]. (Appx18189-18192; Appx20275-20276.) [redacted] told Exmark that Briggs was touting its mowers as having essentially the same cut quality and functionality as Exmark's mowers, but at a substantially lower price. (Id.) Exmark ultimately gave [redacted] price concessions in order to avoid losing the business to Briggs. (Id.; Appx18295-18296.) Those price concessions cost Exmark about [redacted] per mower in 2009 alone. (Appx18295-18296.)

Exmark filed the present lawsuit against Briggs in May 2010. (Appx249.) In the lawsuit, Exmark also asserted infringement by another competitor, unrelated to Briggs, named Schiller Grounds Care, Inc. ("Schiller"). (Appx251.) Both companies were selling mowers with flow control baffles nearly identical to the preferred embodiment shown in the '863 patent:




**'863 patent Fig. 4**



**Briggs Accused Mower**



**Schiller Accused Mower**

(Appx238; Appx21520; Appx22655; Appx22741.)

**1. The Second and Third Reexaminations**

In March of 2012, after the parties had completed fact discovery and the district court had issued its claim construction order, Briggs' co-defendant Schiller filed for reexamination of the '863 patent. (Appx5603.) The reexamination was granted, and the litigation was stayed pending the outcome of reexamination. The

validity of the claims in that reexamination was confirmed less than six months after the request was filed. (Appx245-246.)

In the meantime, Briggs filed yet another request for reexamination. (Appx5657-5662.) Briggs' reexamination request asserted more than 20 bases for alleged invalidity. (Id.) The PTO rejected all of Briggs' invalidity arguments from the outset except one that, as discussed below, was based on an overly broad construction of the claims. (See infra, pp. 31-34.) On July 30, 2014, the PTAB issued its decision finding that, even under the broadest reasonable interpretation standard, the examiner's claim interpretation was "unreasonable" and again affirming the patentability of the claims. (Appx6291-6293.)

### 2. The 2015 Summary Judgment Rulings and Trial

After completion of the second and third reexaminations, the litigation stay was lifted and the parties filed summary judgment motions on a variety of issues. The district court granted summary judgment that Briggs' original product design infringed – a finding that Briggs does not challenge on appeal. (Appx45-46.) The district court also granted summary judgment that Briggs could not satisfy its burden of proving invalidity. (Appx42-45.) The court also denied Briggs' Daubert motion to exclude Exmark's experts. (Appx50-64.)

By agreement of all three parties, the trial against Briggs went first. The jury was asked to decide: (1) whether Briggs' infringement was willful; (2)

whether Briggs' modified design that it adopted after suit was filed infringed; and (3) the damages associated with Briggs' infringement. (Appx17398-17399.)

### a. <u>The Trial Evidence of Willful Infringement</u>

The trial evidence showed that Briggs' predecessor, Ferris Industries, acquired an Exmark Lazer Z in 1996 and copied Exmark's flow control baffles. (Appx121; Appx126-127.) Prior to that time, Ferris' mower decks had, consistent with the conventional wisdom, a rear baffle but no front baffle structure:




(Appx19008; Appx21578.) A Ferris engineering technician testified that, within days of seeing an Exmark Lazer Z at Ferris' facility, he was given instruction by Ferris' head of engineering regarding a front baffle that he was to add to Ferris' deck. (Appx22450-22454; Appx22464-22465.) The technician re-created the sketch that he was given by the head of engineering, which looked strikingly like Exmark's baffles:




(Appx21527; Appx22451-22452.)

The trial evidence also showed that, after copying the invention, Briggs recklessly ignored the risk of infringing the '863 patent. (Appx94; Appx101-102; Appx126-127.) Over the years, Briggs had in its possession at least four Exmark mowers that were covered by the '863 patent and marked with patent stickers identifying the '863 patent. (Appx18595-18602; Appx18639; Appx21544-21577.) Briggs admitted that it knew companies in the mower industry mark their products with patent numbers to provide notice of their patent rights. (Appx18593-18595; Appx22467.) Moreover, at the time this lawsuit was filed, Briggs had in its possession at least nine Exmark brochures that touted the patent and its benefits. (Appx18626-18637; see, e.g., Appx22140-22141; Appx22167.)

The most striking evidence of Briggs' reckless disregard of Exmark's patent rights came from Exmark's earlier lawsuit against Scag. (Appx94-95.) At the time

of the Scag litigation, the current head of Briggs' commercial mower business, Mr. Phil Wenzel, was the president of Briggs' predecessor, Ferris. (Appx11529-11530.) Mr. Wenzel voluntarily appeared as a deposition witness for Scag in that case. (Appx18478-18479.) The law firm that generally represented Ferris in patent matters at that time was also the firm representing Scag in that lawsuit. (Appx18642-18643; Appx18648-18649.) Mr. Wenzel admitted that he asked his/Scag's lawyers about the patents that were involved in the Scag litigation at that time, but he denied actually knowing about the patent. (Appx18643-18644; Appx18652-18655.) The district court found that Mr. Wenzel was aware of the '863 patent as a result of his involvement in the Scag case, and that Wenzel's testimony to the contrary was not credible. (Appx127; Appx94-95; Appx117.)

Briggs' continued to sell infringing mowers for more than eight years after Mr. Wenzel's deposition in the Scag case. (Appx122-123.) Briggs admitted that during that time it never analyzed the '863 patent nor formed any belief that the patent was invalid or not infringed. (Appx19266; see Appx127; Appx18478.) Based on this and other evidence, the jury found that Briggs' infringement of Exmark's '863 patent was willful. (Appx17399.)

#### b. The Trial Evidence on Briggs' Modified Design

Only after Exmark filed suit did Briggs seek to mitigate its damages by modifying its mowers. Demonstrating the value of Exmark's invention, Briggs

neither removed the flow control baffles nor adopted one of the allegedly relevant prior art designs, like Walker. (Appx18693-18697; Appx18707.) Instead, Briggs made a change that it contended avoided the requirement for a "first elongated and substantially straight baffle portion." In Exmark's view, Briggs' modification did not avoid infringement. Below are demonstratives showing how Exmark's technical expert read the claims on Briggs' original and modified designs:




**<u>Briggs' Original Design</u>**




**<u>Briggs' Modified Design</u>**

(Appx11328; Appx11331.)[2] Exmark's expert testified that by mating two curved baffle portions that curved in opposite directions, Briggs created a region around the inflection point where they merged that, as a whole, was straighter than the arcuate baffle portions on either side of it and was "substantially straight." (Appx18125-18128; Appx18156.) Exmark's expert also testified (and Briggs did not dispute), that the minor curvature did not substantially affect the function of the elongated and substantially straight baffle portion. (Id.)

The court found that Briggs' modified design presented a "close case of infringement." (Appx101.) The jury, however, found that Briggs' modified design did not infringe. (Appx17398.) Exmark has not appealed that decision.

### c. The Trial Evidence Relating to Damages

At trial, both parties presented expert testimony regarding a reasonable royalty for infringement of the '863 patent. (E.g., Appx18268; Appx19110.) Both experts did so through an application of the Georgia Pacific factors, and both experts concluded that the proper measure of damages should be a running royalty with the mower as the royalty base. (Appx14446-14456; Appx14773; Appx14783.) The experts differed only on the rate that the parties would have

[2] Briggs wrongly asserts that it adopted a baffle "shape" found in the prior art. (Briggs Br. 19.) The document Briggs cites for this proposition post–dates the '863 patent's priority date by over seven years! (See Appx23784.) The district court correctly found that Briggs' redesign was not available to Briggs at the time of the hypothetical negotiation. (Appx112.)

agreed to in a "hypothetical negotiation." Briggs' expert, John Bone, opined that the parties would have agreed to $10 per mower. (Appx19110.) As discussed in detail below, Exmark's expert, Melissa Bennis, engaged in what the district court called a "rigorous factual and quantitative analysis" to conclude that a 5% royalty (approximately $250 per mower) was the reasonable result of a hypothetical negotiation. (Infra, pp. 53-59.) Exmark also supported its damages case with extensive testimony from its witnesses explaining the importance of the invention and the fact that they would much rather use the exclusive right to the invention to sell more mowers rather than collect a license fee from a direct competitor. (Appx112; Appx17679; Appx17682; Appx17673-17675; Appx18010-18012; Appx18066; Appx18180-18188.)

The jury sided with Exmark and awarded damages in the amount of $24,280,330. (Appx17398.)

### 3. The Bench Trial on Laches and the Post-Trial Rulings

After the jury trial, the district court held an evidentiary hearing to receive additional evidence on Briggs' laches defense. As part of that hearing, Briggs agreed to withdraw all arguments of alleged prejudice except for its argument that, had Exmark filed suit earlier, it would have mitigated its damages by stopping its infringement sooner. (Appx20239-20240; Appx20480-20481.)

The district court rejected Briggs' laches defense for three independent reasons. (Appx100-103.) First, the court found that Exmark's delay in filing suit was not, in view of all of the circumstances, unreasonable. (Appx100.) Second, the court found that Briggs was not prejudiced by the delay and that Briggs' claim that it would have stopped infringing sooner if it had been sued earlier was not credible. (Appx100-101.) Third, the court found that the overall balancing of the equities, including Briggs' conscious copying, rendered a finding of laches inequitable. (Appx101-103.)

In response to the parties' other post-trial motions, the district court issued orders: (1) denying Briggs' post-trial motions for judgment as a matter of law and for a new trial on damages and willfulness (Appx119); (2) doubling damages for Briggs' willful infringement (Appx131); and (3) awarding roughly $1.5 million in prejudgment interest (Appx21227-21228). Final judgment was entered in the amount of $50,101,274. (Appx1.)

## SUMMARY OF THE ARGUMENT

Summary judgment of no invalidity was proper. The district court properly gave substantial, but not dispositive, weight to the three reexaminations of the '863 patent. There were no fact disputes and no reasonable jury could find that Exmark's patent was clearly and convincingly invalid.

The district court also properly rejected Briggs' indefiniteness arguments. The claim phrase "elongated and substantially straight baffle portion" employs language that is ubiquitous in the mower art. Case law has long recognized that words such as "substantially" are not just acceptable in patent claims, they are critically important. The '863 patent provides both structural and functional guidance from which those skilled in the art can ascertain the scope of the claims with reasonable certainty.

The district court did not abuse its discretion in admitting the testimony of Exmark's damages expert, Ms. Bennis. When Mr. Busboom went against the conventional wisdom by designing a side discharge mower with the front baffle, he did not create an improved baffle; he created an improved *mower* that allowed users to mow faster while maintaining a high quality of cut even in difficult cutting conditions and with less engine demand. The district court correctly found that Ms. Bennis performed a detailed and quantitative analysis that apportioned for conventional elements through her application of Georgia-Pacific factors. Ms.

Bennis used the smallest salable patent-practicing unit as the royalty base, and the district court did not abuse its discretion in concluding that this is not one of the rare cases where application of the Georgia-Pacific factors to apportion via the rate was impermissible. Briggs' other objections to the district court's evidentiary rulings are likewise without merit.

Briggs' request for a new trial on willful infringement should be denied. Both the Supreme Court in Halo and this Court in subsequent cases have held that a jury's finding of subjective willfulness is a sufficient predicate for an award of enhanced damages. There is no reason to reach a different result here.

Finally, to the extent laches remains a defense in patent cases, its purpose is not to protect defendants like Briggs who copy an invention and then recklessly ignore the risk of infringement for years. The district court rejected Briggs' laches defense for three independent reasons. Briggs has not shown that the district court abused its discretion with respect to any one of those reasons, much less all of them.

## ARGUMENT

### I. Standard of Review

Briggs' brief omits the standard of review applicable to this Court's review of the jury's damages award. In the Eighth Circuit, "fixing damages is peculiarly a jury function." Wright v. Hoover, 329 F.2d 72, 76 (8th Cir. 1964). The denial of a

motion for a new trial is reviewed for a clear abuse of discretion, with the key question being whether a new trial should have been granted to avoid a miscarriage of justice. Harrison v. Purdy Bros. Trucking Co., 312 F.3d 346, 351 (8th Cir. 2002). The admissibility of expert testimony is also reviewed for abuse of discretion, and will not be reversed absent clear prejudice. Barrett v. Rhodia, Inc., 606 F.3d 975, 980 (8th Cir. 2010).

## II. The District Court Properly Granted Summary Judgment of No Invalidity

Because patents are presumed valid, summary judgment of no invalidity should be granted when the defendant fails to produce clear and convincing evidence from which a reasonable jury could invalidate the patent. Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed. Cir. 2001). Briggs failed to do so here.

### A. Briggs Failed to Present a Genuine Issue of Material Fact on Alleged Prior Art Invalidity

#### 1. The District Court Correctly Gave Substantial, But Not Dispositive, Weight to the Three Reexaminations

Briggs wrongly asserts, without citation, that the district court gave preclusive effect to the PTO reexaminations confirming the patentability of the ‘863 patent claims. In fact, the district court said exactly the opposite in its summary judgment Order: “The court has considered the PTO reexaminations and affords them **some, though not determinative, weight**.” (Appx43 (emphasis added).)

While not dispositive, the three reexaminations of the '863 patent are strong evidence that should be given substantial weight in considering whether Briggs met its burden of proving invalidity by clear and convincing evidence. See Transmatic, Inc. v. Gulton Indus., 53 F.3d 1270, 1275 (Fed. Cir. 1995) (affirming grant of summary judgment, noting that the claims "twice passed scrutiny in the PTO, including a reexamination procedure in which [defendant] participated as the requester"); SRI Int'l v. Advanced Tech. Lab., No. 93-1074, 1994 U.S. App. LEXIS 36220, at *10-14 (Fed. Cir. Dec. 21, 1994) (affirming summary judgment in view of reexamination). Indeed, the very case Briggs cites for the proposition that PTO decisions are not dispositive relied on the "deference that is due to a qualified government agency presumed to have properly done its job" to hold that no reasonable jury could find the patent in suit invalid. Fromson v. Advance Offset Plate, Inc., 755 F.2d 1549, 1558 (Fed. Cir. 1985).

This case law is fully applicable here. The prior art relied on by Briggs was considered by the PTO on multiple occasions. (Appx234; Appx243-247; Appx5965; Appx5603-5605; Appx5657-5662.) The third reexamination was instituted at the request of Briggs, and was accompanied by a 100 page declaration from its technical expert. (Appx6095.) The PTO rejected all but one of Briggs' invalidity arguments from the outset. (Appx6207-6221.) And the one argument that Briggs continues to press here on appeal – invalidity based on the Simplicity

mulching mower – was the subject of extended analysis by the PTO and ultimately a decision by the PTAB rejecting Briggs' argument. (Appx6285-6293.)

Briggs' strategic decision to challenge validity at the PTO gave Briggs advantages that it could not get in district court, including the lack of a presumption of validity and the ability to rely on the broadest reasonable interpretation ("BRI") standard. Yet even with those advantages, Briggs was unable to prevail. Having chosen its forum and lost, Briggs cannot ignore the result. The fact that the PTO fully considered and rejected all of Briggs' invalidity arguments is strong evidence that Briggs has not overcome in this case.

#### 2. No Reasonable Jury Could Find That the Claims Are Anticipated By the Simplicity Mulching Mower

Briggs argues that, despite the PTAB decision to the contrary, a reasonable jury could find the '863 patent claims anticipated by the Simplicity brochure showing a side discharge mower that has been converted to a mulching mower through installation of a mulch kit. (Briggs Br. 45.) The structure of this mower is undisputed. Consistent with the conventional wisdom in the art, the Simplicity mower does not have any front baffles in the side discharge configuration. In the mulching mode, the mulch kit has four components, which are identified by arrows in the following annotated photograph:



**Simplicity Mower With Mulch Kit**

(Appx5602; Appx13064.) The arrow furthest to the left points to an arcuate piece that closes the side discharge opening. (Id.) The other three arrows point to three V-shaped baffles that disrupt the flow and promote recirculation of air and grass clippings to facilitate mulching. (Id.)

This mower is not relevant to the claimed invention of the ‘863 patent. The claims of the ‘863 patent are directed to an improved side discharge mower. This is reflected in the requirement in both independent claims for a “discharge opening” in one of the side walls. (Appx241-242.) When the mulching kit is installed in the Simplicity deck as shown above, there is no longer a discharge opening – it becomes a mulching mower. On this basis alone, summary judgment of no anticipation was appropriate.

Moreover, it is undisputed that the three V-shaped baffles in the Simplicity mulching mower, by themselves, do not come close to meeting the various claim limitations relating to the front flow control baffle. The only reason there is any

argument of relevance to the Simplicity mulching mower is because the V-shaped baffles are mounted to the front wall of the deck by thin mounting plates that extend along, contact, and conform to the front wall of the deck. Only by including these mounting plates is Briggs able to argue that Simplicity shows a "baffle" extending across the entire front of the deck and having the various arcuate and substantially straight baffle portions recited in the '863 patent claims. (Appx5739-5742.)

Even under the BRI standard, the PTAB found this argument to be "unreasonable." (Appx6291.) Under the standard applicable in district court, this argument unquestionably fails. The claims of the '863 patent specify "walls" and "flow control baffles" as separate elements. (Appx241-242.) The claims further state that the front flow control baffle is "positioned *in* said mower deck" and "extends downwardly from the interior surface of said top wall *between said cutting blades and said front wall*." (Id.) The specification shows the flow control baffles as clearly distinct components separate from the walls, and notes that their purpose is to "efficiently direct the grass clippings and air to the side discharge opening." (Appx238-240.) To read this claim language on the mounting plates of the Simplicity mulching mower is contrary to both the intrinsic and extrinsic evidence. (Appx6285-6293; Appx10001-10005.)

Briggs' argument is also contrary to the construction of "flow control baffle" that the parties agreed to in the district court: "structure within the walls of the mower deck that controls the flow of air and grass clippings." (Appx9; Appx464; Appx1459.) As Exmark told the PTAB, a structure "cannot be said to 'control' the flow of air in the deck if it does not change it in some way, i.e., if in the absence of that structure, the flow would be essentially the same." (Appx9990.)[3] Briggs' expert admitted that a thin plate added to the front wall would have no meaningful effect on the flow of air and grass clippings in the deck. (Appx4510.) The thin mounting plates of the Simplicity mulching mower do not change or control the flow, but instead merely create a slightly thicker front wall. (Appx9987-9989.)

A dispute over claim construction does not preclude summary judgment. See Transclean Corp. v. Bridgewood Servs., Inc., 290 F.3d 1364, 1372-73 (Fed. Cir. 2002) (affirming summary judgment of no anticipation based on proper claim construction). Because Briggs' anticipation argument is premised on incorrect claim constructions, summary judgment was proper.

---

[3] Briggs wrongly asserts that the PTAB changed the construction of "flow control baffle" when it accepted Exmark's arguments during the third reexamination. (Briggs Br. 42-44.) As the district court correctly recognized, "the 'meaningful effect' language was adopted by the PTAB merely to explain why the mounting plates of the prior art Simplicity [reference] were not 'flow control baffles.'" (Appx43; see Appx6291.) See Mformation Techs., Inc. v. Research in Motion Ltd., 764 F.3d 1392, 1398 (Fed. Cir. 2014) (district court's explanation "at most clarified," but did not change, the claim construction).

### 3. No Reasonable Jury Could Find That the Claims Would Have Been Obvious

The obviousness section of Briggs' appeal brief refers to at least six different prior art references, without any cogent explanation of how or why those references would be combined to meet all of the claim limitations. (Briggs Br. 44-50.) "Conclusory statements simply mentioning the alleged prior art patent, relying on the same prior art considered by the PTO, and alleging invalidity fail to raise a genuine issue of material fact." Creative Compounds, LLC v. Starmark Labs., 651 F.3d 1303, 1313 (Fed. Cir. 2011).

Briggs' primary argument appears to be that it would have been obvious to space the mounting plates of the Simplicity mulching mower from the front wall because other references show mulching baffles spaced from the front wall. (Briggs Br. 46-48.) This is yet another argument that was presented to and rejected by the PTAB (Appx10009-10013; Appx6285-6293), and for good reason. The purpose of the mounting plates in Simplicity is to attach the V-shaped baffles to the front wall. (Appx6292.) If they were spaced from the front wall, they would no longer perform this function. Modifications that change the basic principles under which the prior art structure was intended to operate are generally not obvious. Plas-Pak Indus. v. Sulzer Mixpac AG, 600 Fed. App'x 755, 758-59 (Fed. Cir. 2015).

Moreover, the shape of the mounting plates of the Simplicity mulch kit is dictated by the fact that they contact and conform to the front deck wall. If one were to space the mounting plates of the Simplicity mulch kit from the front wall so that they served as baffles, why would one skilled in the art nonetheless maintain the shape of the front deck wall? Briggs has not pointed to any prior art where a mulching baffle merely replicates the shape of the front wall. The front baffles in Koehn and Samejima ‘947 are circular in shape. (Appx6464; Appx9447.) Such selective “picking and choosing” of features from the prior art demonstrates improper hindsight, not obviousness. Abbott Labs. v. Sandoz, Inc., 544 F.3d 1341, 1348 (Fed. Cir. 2008).

Finally, Briggs ignores the requirement in the asserted claims for a discharge opening. The Simplicity brochure shows front baffles only in the mulching configuration. (Appx5602.) In the side discharge mode, Simplicity keeps the space in front of the blades entirely open so that air and grass clippings can flow freely in front of the blades on their way to the discharge opening. (Appx10011-10012; Appx13107.) In other words, Simplicity is just another example of the conventional wisdom that taught away from the invention of the ‘863 patent. (Id.)

A dispute over the ultimate legal determination of obviousness does not preclude summary judgment. SRI Int’l, 1994 U.S. App. LEXIS 36220, at *14. The district court properly granted summary judgment of no prior art invalidity.

### B. Briggs Failed to Prove That the Claims of the '863 Patent Are Indefinite

Briggs argues that the phrase "elongated and substantially straight baffle portion" renders the claims indefinite even though (1) it never disputed that its infringing mowers with its original baffle design met this limitation; and (2) it successfully based its non-infringement argument for mowers with its modified baffle design on this very limitation. The fact that Briggs admitted this limitation was present in its original accused products and that its redesign focused on sidestepping this very limitation demonstrates a lack of indefiniteness. That the jury decided that Briggs' redesign did not meet this limitation further demonstrates a lack of indefiniteness.

The district court correctly found that Briggs' indefiniteness argument is "inconsistent with the claim language, the court's claim construction order, its own experts' opinions on what the prior art teaches, and with the common-sense understanding of the terms." (Appx44.)

#### 1. Some Uncertainty in Claim Scope is Both Permitted and Necessary to Protect Inventions Such as This One

A patent claim is invalid for indefiniteness only if, read in light of the specification and prosecution history, it fails to inform those skilled in the art about the scope of the invention with "reasonable certainty." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2129 (2014). While focusing on individual

claim terms can be a "helpful tool," the dispositive question in an indefiniteness inquiry is "whether the claims, not particular claim terms," satisfy the reasonable certainty test. Cox Communs., Inc. v. Sprint Commun. Co., No. 2016-1013, 2016 U.S. App. LEXIS 17372 at *12 (Fed. Cir. Sept. 23, 2016); see also Koninklijke Philips v. Zoll Med. Corp., No. 2014-1764, 2016 U.S. App. LEXIS 13710, at *53 (Fed. Cir. July 28, 2016) (definiteness affirmed even though temperature, age, and numerical parameters had no precise bounds in the patent).

Some uncertainty in claim scope is "the price of ensuring the appropriate incentives for innovation." Nautilus, 134 S. Ct at 2128. This includes the uncertainty inherent in terms of degree such as "substantially," which serve the important function of "avoid[ing] a strict numerical boundary to the specified parameter" and "accommodat[ing] the minor variations that may be appropriate to secure the invention." Ecolab, Inc. v. Envirochem, Inc., 264 F.3d 1358, 1367 (Fed. Cir. 2001); Verve v. Crane Cams, 311 F.3d 1116, 1120 (Fed. Cir. 2002). The fact that terms of degree inevitably result in a gray area where reasonable minds can differ over the scope of a claim term does not render them indefinite. Indeed, the case law is replete with holdings that such terms comport with the definiteness requirement. See, e.g., Deere & Co. v. Bush Hog, LLC, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("substantially planar"); Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1335 (Fed. Cir. 2010) ("not interfering substantially"); Kinzenbaw v. Case

LLC, 179 Fed. App'x 20, 30-31 (Fed. Cir. 2006) ("substantially uniformly distributed" and "substantially on the center line"); Andrew Corp. v. Gabriel Elecs., Inc., 847 F.2d 819, 821-22 (Fed. Cir. 1988) ("substantially equal"). Even the patent claim at issue in Nautilus included multiple instances of "elongate" and "substantially," and neither this Court nor the Supreme Court took issue with those terms. See Biosig Instruments, Inc. v. Nautilus, Inc., 783 F.3d 1374, 1377, 1383-84 (Fed. Cir. 2015) ("elongate member," "substantially equal magnitude and phase," "substantially zero electromyogram signal," "substantially removing EMG signals"). Given that the Supreme Court's definiteness standard itself invokes a term of degree ("*reasonable* certainty"), this is not surprising.

**2. The Ubiquitous Use of "Substantially" and "Elongated" in Mower Patents Shows That Those Skilled in the Art Consider the Terms to Be Definite**

What constitutes reasonable certainty in claim scope "is a function of the nature of the subject matter." Biosig, 783 F.3d at 1382. In this case, the subject matter at issue is not particle accelerators or laser interferometers, which must be precise over large distances to astoundingly tight specifications. The subject matter is lawnmowers.

More than ***1,100 patents*** have issued since 1975 with the words "mower" and "substantially" in the claims. (Appx13039.) That is more than 1/3 of all "mower" patents. (Appx6401.) Similarly, more than ***360 patents*** issued during

that time frame with both "mower" and "elongated" in the claims. (Appx13038-13039.) This includes patents owned by Briggs, as well as patents where Briggs' technical expert, Mr. Del Ponte, is a named inventor. (Id.) The fact that these terms are so commonly used in patent claims shows that, in the art of lawnmowers, the terms have a commonly used meaning and are sufficiently definite for the mower art. See DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1260-61 (Fed. Cir. 2014) (relying on evidence of common usage in the art to reject indefiniteness argument); Fujitsu Ltd. v. Tellabs Operations, Inc., 821 F. Supp. 2d 1009, 1038 (N.D. Ill. 2011) (rejecting indefiniteness argument in part because "patents from the relevant time period…demonstrate that the use of [the term at issue] was common in the art"); see also Deere, 703 F.3d at 1359 (upholding "substantially planar" in claims to a cutting deck); Kinzenbaw, 179 Fed. App'x at 30-31 (upholding "substantially uniformly distributed" and "substantially on the center line" in claims to an agricultural implement).

### 3. The '863 Patent Provides Objective Structural and Functional Boundaries on the Scope of the Invention

Briggs wrongly asserts that the term "elongated and substantially straight" lacks objective boundaries.

The words in the claim phrase have clear and well understood meanings that provide objective boundaries. "Elongated" typically refers to something that is longer than it is wide. (Appx13041; Appx12625.) "Straight," of course, refers to

something that is straight. “Substantially” means something that is not “fully” or “totally.” (Appx13040-13041; Appx12624-12625; see also Appx44.) Thus, the plain meaning of the claim phrase requires a baffle portion that is longer than it is wide and is largely, but not completely, straight.

The surrounding claim language also provides objective boundaries. The “elongated and substantially straight” baffle portion is located between two “arcuate” baffle portions, both of which extend partially around a mower blade. (Appx241, col.6:21-31.) This is shown in the figures in the ‘863 patent and described in the specification. (Appx238; Appx236; Appx240, col.4:1-17.) In the context of a real world mower design, this means that the baffle portion needs to be elongated enough to fill the gap between the two arcuate portions:




FIG. 4

(Id.; Appx241; Appx13041-13042; Appx12625.) The baffle portion must also, as a whole, be straighter than the neighboring arcuate portions. (Id.)

The function of the elongated and substantially straight baffle portion also provides objective guidance. The claims recite that they are "disposed…in a chord-like fashion so that the cuttings from said first cutting blade will be deflected inwardly within the said circle" of the downstream cutting blade. (Appx241-242.) This is also explained in the specification. (Appx240, col.4:37-56.) Thus, the "elongated and substantially straight" baffle portion must be straight enough and long enough to allow for the change in direction of the grass clippings toward and into the path of the downstream cutting blade, as opposed to continuing in a circular manner within the same cutting chamber or being directed outwardly toward the front wall. (Appx13041; Appx12625-12626.) Such functional language "promotes definiteness…by specifying the operations that the [structure] must undertake." Cox Communs., 2016 U.S. App. LEXIS 17372 at *14; see also Eibel Process Co. v. Minn. & Ont. Paper Co., 261 U.S. 45, 65-66 (1923) (upholding the claim term "substantial elevation" because persons skilled in the art could determine the elevation needed for the invention to work).[4]

---

[4] This evidence distinguishes the present case from GE Lighting Solutions, LLC v. Lights of Am., Inc., No. 2015-1979 (Fed. Cir., slip op. Oct. 27, 2016). In GE Lighting, the claim term "elongated" was held indefinite because, unlike here, the specification and claims of that patent provided *no* objective boundaries for the term. GE Lighting, slip op. at 4-5. Moreover, the patentee in GE Lighting relied

#### 4. The Testimony From The Technical Experts Confirms That the Claims Are Not Indefinite

Briggs presents soundbites from Mr. Busboom out of context as alleged admissions of indefiniteness. For example, Briggs claims that Mr. Busboom admitted that he could not explain "sitting here today" how a competitor would determine whether a baffle portion was "elongated" and that there was no "test" or "functional standard" for ascertaining "elongated and substantially straight." (Briggs Br. 51.) A deposition does not require snap judgments to self-serving hypotheticals. Just before the block-quoted testimony that appears in Briggs' brief, Mr. Busboom provided two such standards. He said that if a baffle section were so short that it continued to function as an arcuate portion, it would not be an elongated and substantially straight section. (Appx1239.) He also said that the proportion of the baffle portion to other features of the mower deck would also be instructive. (Id.; Appx1240; Appx1242.) Moreover, there is no requirement in the law for physical testing or for an industry standard that will address each and every possible infringement scenario. Mower decks come in many different sizes and shapes. (See Appx12625.) There are many possible ways that a competitor might vary the shape of the "elongated and substantially straight baffle portion" while

---

on "elongated" during prosecution to distinguish over prior art that met the ordinary meaning of "elongated," creating an "unresolved ambiguity." Id.; see also U.S. Patent No. 4,733,335, fig. 9, element 153. No such ambiguity exists here.

still appropriating Exmark's invention. (See, e.g., Appx6450; Appx6452.) That Mr. Busboom could not, in the abstract, identify a single test or standard that would address each and every one of these permutations is irrelevant.

The fact is that both of Exmark's experts, Dr. Strykowski and Mr. Busboom, assessed the claims of the '863 patent to be definite. (Appx13035-13046; Appx12610-12611; Appx12624-12626.) Both experts laid out in detail objective criteria that they looked at to determine whether a structure met the "elongated and substantially straight" requirement. (Appx13040-13042; Appx12625-12626.) While Briggs argues that none of those factors provides an objective guide, merely continuing to say so does not make it so. At most, Briggs' arguments merely establish that the experts' criteria do not provide an exact mathematical boundary. But the law does not require such exacting boundaries.

Finally, Briggs' technical expert had no trouble determining whether a variety of different structures met the "elongated and substantially straight" limitation. (Appx4475; Appx4932; Appx4512-4513; Appx6450; Appx6452.) The fact that Mr. Del Ponte was able to make these determinations belies Briggs' claim that persons skilled in the art cannot ascertain the scope of the claims with reasonable certainty.

## III. The District Court Did Not Abuse Its Discretion by Denying Briggs a New Trial on Damages

Briggs has not appealed the denial of its motions for JMOL and remittitur, and it does not dispute that the jury's damages award is supported by substantial evidence presented at trial. Briggs also has not appealed the sufficiency or correctness of the jury instructions concerning reasonable royalty damages.

Briggs seeks a new trial on damages based solely on allegedly erroneous admission of expert testimony and two other evidentiary rulings by the district court. Yet, Briggs does not even mention the district court's Daubert ruling, or acknowledge the abuse of discretion standard of review it faces in challenging evidentiary rulings. (See supra, pp. 28-29.) The district court's rulings regarding damages and the other evidentiary issues were not an abuse its discretion.

### A. The District Court Did Not Abuse Its Gate Keeping Role in Admitting the Testimony of Exmark's Damages Expert

The linchpin of Briggs' damages argument is its claim that the district court "held that apportionment was unnecessary." (Briggs Br. 56.) This is simply not true. The district court expressly said the opposite at least three times. (Appx63 ("The proper damages analysis in this case nonetheless requires apportionment..."); Appx59-60, Appx109-110.) The court found that Exmark's expert, Ms. Bennis, apportioned for conventional elements through her application of the Georgia-Pacific factors to identify an appropriate royalty rate. (Appx63; Appx111-113.)

Applying the Georgia-Pacific factors to identify an appropriate royalty rate is a well-accepted methodology for apportionment. Astrazeneca AB v. Apotex Corp., 782 F.3d 1324, 1338 (Fed. Cir. 2015); Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1226 (Fed. Cir. 2014) (apportionment can be done in various ways, including "by careful selection of the royalty base…, by adjustment of the royalty rate…, or by a combination thereof").

Apportionment refers to the "essential requirement" under Daubert that "the ultimate reasonable royalty award…be based on the incremental value that the patented invention adds to the end product." Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc., 809 F.3d 1295, 1301 (Fed. Cir. 2015). Adaptability in identifying an appropriate methodology for apportionment is necessary "because different cases present different facts." Id. at 1301-02.

This Court has "developed certain principles to aid courts in determining when an expert's apportionment model is reliable." Id. at 1302. One such principle is the "smallest salable patent-practicing unit" principle, which provides that "where a damages model apportions from a royalty base, the model should use the smallest salable patent-practicing unit as the base." Id. (citation omitted).

Another principle is that conventional elements can be rendered more valuable by their use in combination with an invention. Astrazeneca, 782 F.3d at 1338. "If the claimed invention adds significant value to the conventional

element(s), the damages award may reflect that value." Univ. of Pittsburgh v. Varian Med. Sys., Inc., 561 Fed. App'x 934, 947 (Fed. Cir. 2014); see also Astrazeneca, 782 F.3d at 1339 ("It is not the case that the value of all conventional elements must be subtracted from the value of the patented invention. . . . [T]he question is how much new value is created by the novel combination, beyond the value conferred by the conventional elements alone." (citation omitted)).

The district court in this case did not abuse its discretion by applying these apportionment principles to conclude that the mower could be used as the base and that Ms. Bennis appropriately apportioned through her application of the Georgia-Pacific factors to identify an appropriate royalty rate.

#### 1. Using The Mower As The Base Was Appropriate Under The Facts Of This Case

Ms. Bennis's use of the mower as the base was appropriate for at least six reasons.

One, the mower was the "smallest saleable patent-practicing unit." The claims of the '863 patent are directed to a "multiblade lawn mower." (Appx241-242.) The infringing products are Briggs' mowers. As the district court correctly found, Briggs' argument "relies on the faulty premise that the patent-in-suit is limited to baffles. In this case, the claimed invention is a lawn mower that is

configured with baffles in a certain way. The accused products are lawn mowers....” (Appx62-63.)

In this regard, Briggs improperly conflates general principles of apportionment with the entire market value rule (“EMVR”). (See, e.g., Briggs Br. 38, 55-57.) As discussed above, apportionment is something that must be done in every reasonable royalty analysis. The EMVR is something different. It applies when a patentee seeks damages on more than the smallest saleable patent-practicing unit. Commonwealth, 809 F.3d at 1302. Because Ms. Bennis did not use more than the smallest salable patent-practicing unit as the base, Exmark’s damages theory was not based on the EMVR. Id.; Varian, 561 Fed. App’x at 947. Briggs’ discussions of the EMVR are irrelevant, and its reliance on cases where the base was not limited to the smallest saleable patent-practicing unit is unfounded.

Contrary to Briggs’ contention, this is not a case where clever claim drafting was employed to improperly broaden the royalty base. Mr. Busboom’s specific improvement – the addition of the flow control baffles – interacted with the other claimed components to make those other claimed components and the overall mower work better. For example, the “front flow control baffle” works with the “rear flow control baffle” to create a cutting chamber around each blade with the claimed “throat portions” between adjacent blades. (Appx240-242; Appx17781-17782.) The shape and orientation of the front and rear baffles direct air and grass

clippings into the blade tip path of the claimed downstream cutting blades to maintain a high rate of flow through the deck. (Appx17713-17715; Appx17725; Appx17737-17740; Appx18113-18119; Appx21450.) The front baffle and deck walls cooperate to reduce blowout. (Id.) And significantly, the claimed mower deck with the baffles, blades, and throat portions improves the airflow under the deck, which lowers horsepower requirements on the claimed "power means." (Id.; Appx241-242; Appx13123-13126; Appx17715-17716; Appx24167.)

There was overwhelming evidence at trial that the benefits provided by the combination of the flow control baffles and the other claimed components were extremely valuable and went to the heart of why landscape contractors buy commercial lawnmowers. (See, e.g., Appx112; Appx17673-17674; Appx17677; Appx18010-18014; Appx18180-18184; Appx18191; Appx18958.) A mower that can mow faster while maintaining a high quality of cut is a more productive *mower* and, therefore, a more valuable *mower*. (Id.) As the district court noted after trial, the "benefits of the invention—improved cutting performance, a reduction of blowout, a more uniform discharge, and a faster cut with less engine demand—all go right to the heart of the purpose and function of the accused product." (Appx113.)

Two, the benefits of the flow control baffles go to the heart of the one and only thing that the claimed mowers do – cut grass. (Appx112-113.) This is a

fundamental difference between this case and the computer and smartphone cases relied on by Briggs. In those cases, the EMVR applied and/or further apportionment of the base was required because the claimed invention covered only one aspect of an accused product that performed many independent functions. See Laser Dynamics, Inc.v. Quanta Computer, Inc., 694 F.3d 51, 56-57 (Fed. Cir 2012); VirnetX, Inc. v. Cisco Sys., Inc., 767 F.3d 1308, 1314-15 (Fed. Cir. 2014); Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1296-97 (Fed. Cir. 2011); Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1310-11 (Fed. Cir. 2009). That is not the case here. The mowers at issue here only mow. In many cases outside of the computer and smartphone world, this Court has not required apportionment of the base even when the patent is directed to an improved assembly made up of new and conventional components. Astrazeneca, 782 F.3d at 1338-39 (pharmaceutical formulations); Varian, 561 Fed. App'x at 946-47 (radiology treatment machines); Douglas Dynamics, LLC v. Buyers Prods. Co., 76 F. Supp. 3d 806, 817-18 (W.D. Wis. 2014), aff'd, 628 Fed App'x 767 (Fed. Cir. 2016) (snow plow assembly); Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1340, 1346-47 (Fed. Cir. 2011) (laser-cutting machine for manufacturing stents); State Contr. & Eng'g Corp. v. Condotte Am., Inc., 346 F.3d 1057, 1061, 1072 (Fed. Cir. 2003) (ground support columns and reinforced concrete members).

Three, using the mower as the royalty base reflects the relationship between Exmark and Briggs. Exmark and Briggs do not compete in the sale of baffles. They compete in the sale of lawnmowers. (Appx14430; Appx18188; Appx18191-18193.)

Four, the record includes many other licenses in the mower industry where the overall mower was used as the royalty base, even when the improvement was directed to some specific aspect of the mower. (Appx14437-14443; Appx14777-14781; Appx21836-21837.) This is strong evidence of the appropriate base to use in analyzing reasonable royalty damages. See Commonwealth, 809 F.3d at 1303 (relying on licensing practice to identify the royalty base).

Five, this is not a case where it was misleading or prejudicial to allow the jury to learn the defendant's overall mower revenue. See Uniloc, 632 F.3d at 1320. Not only did Briggs not object to introduction of its overall mower revenue at trial, Briggs repeatedly raised and discussed that revenue at length. (See, e.g., Appx18351-18352; Appx18355; Appx18364; Appx18369.) The mower is the commercial unit of sale for both Exmark and Briggs. There was no risk in this case that using the mower as the base would artificially inflate the jury's calculations beyond that adequate to compensate for the infringement.

Six, as the district court correctly found, Briggs' argument is "considerably weakened by its own expert's reliance on methodology similar to that employed by

Ms. Bennis." (Appx63.) Just like Ms. Bennis, Briggs' damages expert used the mower as the base and apportioned via the rate. (Appx14773; Appx19110 ("Right, the analysis -- so I had a base, which is [redacted] mowers, and then the next step was to determine what's the proper rate, which I came to $10.").) And both experts arrived at their opinions through application of the Georgia-Pacific factors. (Appx14446-14456; Appx14783; Appx19087.)

The similarity between the experts' methodologies was particularly striking in the real world of the Daubert hearing and the trial. While Ms. Bennis expressed her opinion as a percentage of mower revenue, both parties repeatedly referred to her opinion as "$250 per mower." (E.g., Appx17632; Appx17682; Appx18291; Appx18296; Appx18684; Appx18686-18687; Appx19099.)[5] In other words, the dispute between the parties and their experts was not whether the mower was the proper base, but whether the appropriate rate was $10 per mower or the equivalent of $250 per mower. The fact that both experts used such similar methodology belies Briggs' argument that the district court abused its discretion by not excluding Ms. Bennis' testimony.

---

[5] Briggs' average selling price for its mowers over the infringement period was around [redacted]. (Appx14429; Appx18290-18291.)

### 2. Ms. Bennis's Opinion, Including Her Apportionment for Conventional Elements, Was Well Supported By the Evidence

In the present case, Ms. Bennis scrupulously analyzed the Georgia-Pacific factors to apportion the value of the invention. She considered the benefits of the patented technology (Appx14420-14426); the sales and profitability of products incorporating the patent-in-suit (Appx14426-14430); the competitive relationship between Exmark and Briggs (Appx14430-14431); the potential for lost sales by Exmark and price erosion on sales of Exmark's mowers (Appx14431-14436); a prior settlement agreement involving the patent-in-suit (Appx14436-14437); other license agreements in the mower field (Appx14437-14444); the availability of non-infringing alternatives and design-arounds (Appx14444-14446); and the assumption that the '863 patent is valid and infringed (Appx14446; Appx14455). She analyzed each of the Georgia-Pacific factors in detail, including the "utility and advantages of the patented property over the old modes and devices" (factor 9) and the "portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements" (factor 13). (Appx14446-14456; Appx18278-18296.) These factors bear directly on the apportionment analysis. Astrazeneca, 782. F.3d at 1338; Varian, 561 Fed. App'x at 948.

Briggs does not seriously dispute that Bennis apportioned for conventional components in arriving at her reasonable royalty opinion, nor could it. Exmark and

Briggs are head-to-head competitors. (Appx14430; Appx17675; Appx18188.) Therefore, if Exmark's invention were the sole basis for demand of the mowers at issue (i.e., if but for Exmark's invention, customers would not have bought Briggs' mowers), then Exmark likely would have been entitled to lost profits. See Micro Chem., Inc. v. Lextron, Inc., 318 F.3d 1119, 1122 (Fed. Cir. 2003) (discussing "but for" standard for lost profits damages). The fact that Ms. Bennis' royalty is only a small fraction of Exmark's incremental profits on mowers proves that she assigned substantial value to aspects of the mower other than the patented invention.

Briggs real complaint is that Ms. Bennis did not apply a mathematical formula to quantify her apportionment. (Briggs Br. 58-59.) However, the law does not require a mathematical formula. Instead, the law prohibits relying solely on "qualitative testimony" that is not "anchored to a quantitative market valuation." Commonwealth, 809 F.3d at 1302.

Ms. Bennis' opinion was soundly anchored to quantitative market valuation evidence. For example, Ms. Bennis did not merely rely on somebody telling her that the invention of the '863 patent was important; she relied on quantitative marketing studies showing that cut quality (a key advantage provided by the invention) is the most important feature for a cutting deck. (Appx14421; Appx23622.) She also relied on the extensive marketing literature from both

parties showing the importance of productivity – another key advantage of the patented invention. (Appx14411; Appx14453; Appx22282; Appx23052.)

Additional key pieces of quantitative market valuation evidence relied on by Ms. Bennis were Briggs' "selling value" documents that reflected the value that Briggs placed on various aspects of their mowers. (Appx14451-14452.) Here is an example:

# SELLING VALUE

## ADDED VALUE FEATURES

| | |
|---|---|
| Ten-gauge double top mower deck with double reinforced side skirts and lap-welded corners | $100 |
| Hanging deck frames | $100 |
| Adjustable 360 degree rotating anti-scalp rollers | $ 50 |
| Foot operated deck lift | $ 75 |
| Twin A-section hydro drive belts | $ 25 |
| Internal reserve reservoir | $ 25 |
| Rotationally molded polyethylene fuel tanks with large filler necks | $ 75 |
| Two-wheel front IS® independent suspension | $200 |
| Two-wheel rear IS® independent suspension | $250 |
| Four-wheel (front & rear) IS independent suspension | $350 |
| Dual point pivoting front axle | $100 |
| Hydrostatic pumps with cooling fans | $ 50 |
| Dual screen filters | $ 50 |
| Two year commercial warranty | $200 |
| One horse power | $100 |

(Appx21873; see also Appx22111.) Ms. Bennis' royalty, which equated to approximately $250 per mower, compares very reasonably to this quantitative

valuation. Briggs valued one additional horsepower at $100, while reduced horsepower demand is just one of several advantages of Exmark's invention. Briggs valued its patented independent suspension systems at $200-$350 (and as high as $750 in other documents), even though they only peripherally affect cut quality and productivity. (Appx21873; Appx22111.) Testimony and evidence explained why Exmark's invention was more important than independent suspension. (Appx14451-14452; Appx17672-17673; Appx17803; Appx18180-18181; Appx18227-18228; see also Appx18679-Appx18687.)

The 5% royalty was also supported by Exmark's settlement agreement with Scag. Scag agreed to pay Exmark [redacted] of its revenue on mowers covered by the '863 patent. (Appx18328-18330; Appx21836-21837.) Real world settlements like this one reflect the costs and risks of litigation, and therefore tend to be lower than a royalty entered into in the "hypothetical negotiation" where patents are conclusively assumed to be valid and infringed. Nonetheless, the [redacted] rate agreed to by Exmark and Scag is another quantitative data point that supports Ms. Bennis' opinion.

The 5% royalty was also supported by Ms. Bennis' quantitative analysis of the parties' profit margins. With respect to Exmark, Bennis calculated that Exmark's standard gross profit on patented mowers is approximately [redacted] (an average of [redacted] per mower) and its incremental profit is approximately [redacted] (an

average of [redacted] per mower). (Appx14427; Appx18286-18287.) The patentee's profit margin is particularly relevant in a case like this, where Exmark is a practicing entity who does not license its technology. (Appx17679; Appx17682.) Exmark uses its patented technology to increase market share, not generate licensing revenue. (Id.) Ms. Bennis correctly recognized that allowing a competitor to use the patented technology very well could result in lost sales to Exmark and that, therefore, it would be reasonable that Exmark would require at least a 5% royalty for use of the invention. (Appx14431-14432; Appx14454-14455; Appx18298).[6]

As for Briggs' profits, Ms. Bennis found that during the damages period, Briggs earned a standard gross profit of [redacted], even though its target gross profit margin was [redacted]. (Appx14455-14456; Appx18289-18293.) Thus, Briggs could afford to pay a 5% royalty and still meet its target gross profit margins, without even needing to adjust the price of its mowers. (Id.) She also disputed Briggs' assertion (repeated on page 55 of its brief) that a 5% royalty represents "over [redacted] of Briggs' net profits." (Appx18331-18333; Appx18335-18336;

---

[6] Exmark's profit margin shows the absurdity of the $10 per mower royalty proposed by Briggs' expert in a competitive situation where there is a risk of lost sales. As Mr. Bone admitted, if Exmark lost a single sale due to Briggs' use of Exmark's technology, Exmark would need to receive [redacted] ***royalties*** at the rate of $10 per mower to make up for that single lost sale. (Appx19134.) As Ms. Bennis stated, $10 per mower is "just simply not a number that we see within the review of these documents in this case. . . it's a de minimis number." (Appx18302.)

Appx18382-18383.) As Exmark showed on cross examination, Briggs' damages expert improperly double-counted certain costs in an effort to present a lower profit number for Briggs. (Appx19122-19131.) The district court agreed, finding that "[t]he jury awarded Exmark roughly $250 per mower and the evidence establishes that Briggs earned a considerably larger profit than that on every mower it sold." (Appx113.)

Finally, Ms. Bennis' opinion was also supported by her quantitative analysis of price erosion resulting from Briggs' efforts to take business away from Exmark with infringing mowers. (Appx14433-14435.) In one example, Exmark was forced to reduce the price of mowers by approximately [redacted] per mower to avoid losing sales to its largest customer. (Appx14433; Appx14456; Appx18295-18296.) The fact that it cost Exmark [redacted] per mower to avoid losing sales to an infringing competitor is yet another quantitative data point showing that a royalty of approximately $250 per mower was not unreasonable.

The district court did not abuse its discretion in finding that Ms. Bennis engaged in a "rigorous factual and quantitative analysis" of damages. (Appx111-112.) Any dispute about the relative value of this invention was ultimately a question of fact for the jury. i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon

sufficiently related to the case at hand, disputes about the degree of relevance or accuracy…go to the testimony's weight, but not its admissibility.").

### B. The District Court Did Not Abuse Its Discretion In Excluding Certain Prior Art

Contrary to Briggs' assertion, the district court did not exclude all prior art in connection with damages. Briggs was free to introduce any such evidence as long as it was (i) actually commercialized; and (ii) directed to side discharge mowing. (Appx73.) Consistent with these limitations, the district court allowed Briggs to introduce the Walker mower and to argue its relevance to damages. (E.g., Appx17615-17616; Appx17622; Appx18360.)

Considering their marginal relevance and the potential for jury confusion, it was a proper exercise of the district court's discretion under Fed. R. Evid. 403 to exclude mulching mowers and non-commercialized designs. Georgia-Pacific factor nine considers "[t]he utility and advantages of the patent property over the old modes or devices, if any, that ***had been used*** for working out ***similar results***." (Appx73 (emphasis added).) With the exception of Kidd, the prior art that Briggs complains was erroneously excluded are all mulching mowers. (Appx1194 (Koehn); Appx5602 (Simplicity); Appx5771-5772 (Samejima '635); Appx9453 (Samejima '947).)[7] The district court did not abuse it discretion in finding that

[7] Briggs disingenuously points out that the Simplicity brochure also shows side discharge mowers. (Briggs Br. 26-27, 47, 66.) Briggs never sought to introduce

mulching mowers do not produce "similar results" to side discharge mowers. (Appx73; see Appx16468-16469.) As for Kidd, Briggs presented no evidence that the mower shown in that patent "had been used," i.e., was ever commercialized.

### C. The District Court Did Not Abuse Its Discretion in Limiting Briggs' Arguments Regarding Alleged Delay

Briggs' last argument for a new trial on damages is also factually incorrect. Briggs was not prevented from introducing evidence or argument regarding Exmark's alleged delay in filing suit. (See, e.g., Appx17627-17628 ("From 2003 to 2010, Ferris continues to sell without a word, without an email, without a letter, without a phone call, without a comment over a beer at a trade show, hey, by the way, you infringed."); Appx17863-17864; Appx17985-17987; Appx18462-18463; Appx19271; Appx23827.) The only thing Briggs was precluded from doing was expressly arguing to the jury that, because Exmark did not sue until 2010, the invention must not have been that valuable to Exmark. (Appx70-71.)

This was also a proper exercise of the district court's discretion under Fed. R. Evid. 403. The district court properly questioned the probative value of Briggs' argument, stating: "[t]here are many reasons to forego filing a lawsuit, to imply that Exmark did so because it did not think the invention had value is speculative."

---

the portions of the Simplicity brochure showing side discharge mowers, which is not surprising because they reflect the conventional wisdom of a side discharge deck with no front baffle. Rather, just as it does on appeal, Briggs sought to confuse the jury with mulching art.

(Appx71.) Briggs' contention that this argument is relevant to Georgia-Pacific factors 4 and 15 is belied by the fact that its own damages expert did not rely on alleged delay in filing suit in conducting his analysis of these factors. (Appx14786; Appx14793-14794.) The district court also recognized that allowing Briggs to make this argument would result in delay and confusion of the issues. (Appx71; Appx17844-17851; Appx17854-17855; Appx18106-18107.) Balancing this against the low probative value of Briggs' argument, the court ruled that the evidence of alleged delay could come in, but precluded Briggs from expressly arguing that this alleged delay is relevant to damages. (Id.) Again, this was not an abuse its discretion and certainly does not justify a new trial.

## IV. ***Halo* Does Not Justify a New Trial on Willful Infringement**

In exercising its discretion regarding whether and how much to enhance damages under 35 U.S.C. § 285, the district court made detailed findings regarding the factors set forth in Read Corp. v. Portec, Inc., 970 F.2d 816, 827 (Fed. Cir. 1992). (Appx120-129.) Briggs does not challenge the district court's enhancement findings or analysis on appeal. Briggs also does not argue that the Supreme Court's recent Halo decision affects the district court's enhancement analysis or requires a remand for the district court to revisit that analysis. Further, Briggs does not argue that the jury's finding of willful infringement was unsupported by or against the weight of the evidence. None of this is surprising

considering the robustness of the willfulness evidence presented by Exmark. (See, supra, pp. 20-22.)

Instead, Briggs' sole argument on appeal is that Halo mandates a remand for a new jury trial on willful infringement. (Briggs Br. 69-72.) Briggs is wrong. In Halo, the Supreme Court eliminated the "objective prong" of willfulness and lowered the standard of proof to preponderance of the evidence. Halo Elecs., 136 S. Ct. at 1932-34. Nothing in the present case is inconsistent with Halo.

Importantly, the Supreme Court also held that subjective willfulness alone is sufficient basis to award enhanced damages. Id. at 1933. Consistent with this holding, this Court has already held multiple times that a jury's finding of willful infringement under the subjective prong of the pre-Halo law was sufficient for a predicate finding of willful infringement under Halo. WesternGeco L.L.C. v. Ion Geophysical Corp., No. 2014-1526, 2016 U.S. App. LEXIS 17215, at *8 (Fed. Cir. Sept. 21, 2016) ("Halo did not disturb the substantive standard for the second prong of Seagate, subjective willfulness"); Stryker Corp. v. Zimmer, Inc., No. 2013-1668, 2016 U.S. App. LEXIS 16646, at *24-25 (Fed. Cir. Sept. 12, 2016); Innovention Toys, LLC v. MGA Entm't, Inc., No. 2014-1731, 2016 U.S. App. LEXIS 14371, at *4-5 (Fed. Cir. Aug. 5, 2016). Indeed, such a finding under the old clear-and-convincing-evidence standard "is more demanding than needed."

Innovention, 2016 U.S. App. LEXIS 14371 at *4; see also WBIP, LLC v. Kohler Co., 829 F.3d 1317, 1339 n.10 (Fed. Cir. 2016).

Briggs points out that Halo requires a jury to determine whether the defendant's conduct was reckless or unreasonably risky. (Briggs Br. 70.) That is exactly what the jury was instructed here:

> To prove that Briggs acted willfully, Exmark must prove, by clear and convincing evidence, that Briggs was ***reckless***. You must determine whether Exmark has shown by clear and convincing evidence that an ***unjustifiably high risk of infringement*** was known to Briggs or was so obvious that it should have been known to Briggs.

(Appx17484 (emphasis added).) This instruction was modeled on the 2014 Federal Circuit Bar Association's Model Patent Jury Instruction on subjective willfulness and is substantively identical to the instruction found sufficient in WesternGeco, 2016 U.S. App. LEXIS 17215, at *11. The jury was not told, as Briggs wrongly suggests (Briggs Br. 70.), that it could find willful infringement based solely on a finding that Briggs knew or should have known of "the existence of the patent."

Briggs next complains that the jury was not expressly instructed that willfulness must be analyzed at the time of the infringement. (Briggs Br. 70.) Notably, however, the jury was not instructed that some other time frame should be analyzed for willfulness. (Appx17484-17485.) At most, Briggs is alleging that it was error to not provide an additional instruction. A party cannot assert an error of

omission in jury instructions unless the party asked at trial to have that jury instruction given. E.g. Melford Olsen Honey, Inc. v. Adee, 452 F.3d 956, 966 (8th Cir. 2006). Briggs failed to do so here.

Finally, Briggs argues that it should have been allowed to present evidence and arguments regarding invalidity in order to rebut Exmark's willfulness allegations. (Briggs Br. 70-72.) That argument fails in view of Halo. Halo held that a party cannot avoid willful infringement by pointing to defenses that it was not aware of at the time of the infringement. Halo, 136 S. Ct. at 1932-33. It is undisputed that Briggs had no invalidity positions prior to those developed by its lawyers during this litigation. (Appx19266; see Appx127; Appx18478.) Indeed, despite all the evidence to the contrary, it steadfastly maintained that it knew nothing about the '863 patent until it was sued. (Id.)

As this Court has held: "[T]iming does matter. [An infringer] cannot insulate itself from liability for enhanced damages by creating an (ultimately unsuccessful) invalidity defense for trial after engaging in the culpable conduct of copying, or 'plundering,' [the patentee's] patented technology prior to litigation." WBIP, LLC, 829 F.3d at 1340-41. The district court did not abuse its discretion by excluding evidence and arguments regarding invalidity defenses that Briggs claims it might have been able to come up with had it not recklessly ignored the risk of infringing Exmark's patent.

## V. The District Court Did Not Abuse Its Discretion in Rejecting Briggs' Laches Defense

To prevail on laches a defendant must prove: (1) an unreasonable delay in filing suit; and (2) that the defendant was materially prejudiced by the delay. SCA Hygiene Prods. v. First Quality Baby Prods., 807 F.3d 1311, 1317 (Fed. Cir. 2015). Even if these elements are proven, a finding of laches still does not automatically follow. A. C. Aukerman Co. v. R. L. Chaides Constr. Co., 960 F.2d 1020, 1036 (Fed. Cir. 1992). "The application of the laches defense is discretionary, and as an equitable matter, the district court is to look to all the facts and circumstances of the case and weigh the equities of the parties." Gasser Chair Co. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 773 (Fed. Cir. 1995) (citing Aukerman, 960 F.2d at 1032).

The district court in this case made detailed fact findings and ruled against Briggs on unreasonable delay, prejudice, and the balance of the equities. (Appx87-103.) Briggs has not shown that any of these three independent bases for rejecting Briggs' laches defense constituted an abuse of discretion.

### A. The District Court Did Not Misapply the Law in Concluding That Exmark Did Not Unreasonably Delay in Filing Suit

Briggs does not challenge the district court's fact findings, but instead accuses the district court of making two errors of law. Briggs is wrong on both counts.

First, contrary to Briggs' assertion, the district court did not err by not finding a presumption of laches. (Briggs Br. 73.) As Briggs acknowledges, Exmark merely chose *not to dispute* that it should have known of infringement (limited to Briggs' Ferris brand) in 2001. (Appx20945-20947.) The district court did not abuse its discretion by nonetheless holding Briggs to its burden of proof and finding that the evidence was insufficient to show that Exmark should have known of Briggs' infringement more than six years before filing suit. (Appx100-101.) Briggs makes no effort to show why that fact finding was clearly erroneous.

More importantly, the district court also found that, even if the presumption applied, it was rebutted by Exmark showing that any alleged delay was not unreasonable. (Appx100.) Briggs has not attempted to show that any of the court's fact findings are clearly erroneous. Thus, regardless of whether the presumption applies, the district court did not err in finding that the first prerequisite of laches, unreasonable delay, was absent in this case.

Second, the district court did not commit an error of law by giving weight to Exmark's reasons for not filing suit earlier and by not requiring that Exmark expressly advise Briggs of its patent rights. Patentees are permitted to exercise reasonable business judgment in deciding not to bring suit. See Aukerman, 960 F.2d at 1033 (citing Tripp v. United States, 406 F.2d 1066 (Ct. Cl. 1969), (recognizing "extent of infringement" as a justification)); cf. Petrella v. MGM, 134

S. Ct. 1962, 1976 (2014) ("Even if [a copyright] infringement is harmful, the harm may be too small to justify the cost of litigation."). Unlike in the cases cited by Briggs, there is no evidence that Exmark refrained from filing suit for the purpose of waiting for damages to escalate. Indeed, the evidence was exactly the opposite. (Appx91; Appx20271-20272; Appx20284-20285.)

Moreover, as the district court found, Exmark provided notice of its patent rights to the entire industry, including Briggs, and it did so in multiple ways. (Appx92; Appx103.) Exmark provided notice by marking its products. (Id.; Appx20280.) Briggs acquired at least four Exmark mowers prior to suit that were marked with the patent number, and Briggs' Mr. Wenzel admitted that he knew companies in the mower industry notified competitors of their patent rights by marking. (Appx18593-18602; Appx18639; Appx21544-21577.) Exmark also provided notice by touting its patent in nearly all of its marketing materials. (Appx20280-20281.) Briggs had at least nine such Exmark brochures in its possession at the time this lawsuit was filed. (Appx18626-18637.)

Exmark also provided notice to the industry in 2001 by suing its largest competitor, Scag, for patent infringement. (Appx102-103; Appx20281.) Briggs' Mr. Wenzel was deposed in that lawsuit. (Appx18478-18479.) The district court rejected Mr. Wenzel's unbelievable claim that he did not learn about Exmark's '863 patent in connection with his deposition in Scag. (Appx102; Appx127.)

The district court credited Exmark's testimony that, in view of the steps Exmark took to notify the industry of its patent rights, competitors in the industry knew about Exmark's '863 patent. (Appx92; Appx103; see Appx20280-20281.) It would "place form over substance" to require Exmark to write to Briggs to tell them what Exmark believed Briggs already knew. See Aukerman, 960 F.2d at 1039. The district court did not err.

### B. The District Court Did Not Err in Rejecting Briggs' Sole Argument for Material Prejudice

At the laches hearing, Briggs abandoned all arguments of alleged prejudice except its argument that, had Exmark filed suit earlier, it would have switched to a non-infringing alternative earlier, therefore mitigating its damages. (Appx20239-20240; Appx20480-20481; see Appx20752.)

Briggs argues that the district court erroneously found that Briggs "could not have designed around the '863 patent." (Briggs Br. 74.) The district court made no such finding. The issue was not what Briggs "could have" done, but rather was whether Briggs *would have* stopped infringing sooner and, if so, whether such a design-around would have been acceptable. The district court found that, if Exmark had sued earlier, Briggs would have attacked the validity of the patent and denied infringement, and would not have changed to an acceptable non-infringing design. (Appx100-101.) Briggs has not challenged this finding and there is no basis to challenge it.

Briggs' prejudice argument is belied by the fact that it knew about the risk associated with Exmark's patent at least as early as 2002, but never switched until suit was filed. An infringer who knows about the patent and makes a "business decision or gamble that the patent owner would not sue" cannot claim economic harm resulting from the delay. Gasser Chair, 60 F.3d at 775. The same is true of an infringer who recklessly ignores the risk of infringement. See Global Traffic Techs., LLC v. Emtrac Sys., Inc., No. 10-4110, 2014 U.S. Dist. LEXIS 57840, at *30-31 (D. Minn. 2014); Yeda Research & Dev. Co. v. ImClone Sys., 443 F. Supp. 2d 570, 630 (S.D.N.Y. 2006). There is no basis to disturb the district court's rejection of Briggs' prejudice argument.

### C. Briggs' Failure to Challenge the District Court's Balancing of the Equities is Fatal to Its Request for a Remand

Independent of its findings of no unreasonable delay and lack of prejudice, the district court found that the balance of the equities favored Exmark. (Appx101-103.) Briggs makes no effort to challenge this finding. Briggs' failure to challenge the balancing of the equities is fatal to its request for a remand on laches. See Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd., 807 F.3d 1283, 1298-99 (Fed. Cir. 2015) (affirming finding of no laches even though patentee unreasonably delayed and the defendant suffered prejudice as a result).

Also, despite rejecting Briggs' laches defense, the district court did penalize Exmark for failing to file suit sooner. In response to Exmark's motion for

prejudgment interest, the district court acknowledged that the prime interest rate is a generally accepted rate for a patentee such as Exmark. (Appx21222-21223.) The district court nonetheless declined to use that rate because of Exmark's delay in filing suit. (Appx21226-21228.) That ruling reduced Exmark's prejudgment interest from over $8.5 million to roughly $1.5 million. Exmark has not appealed that discretionary ruling.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

For the foregoing reasons, the final judgment of the district court should be affirmed.

Respectfully Submitted,

Dated: October 28, 2016

*/s/ J. Derek Vandenburgh*
J. Derek Vandenburgh
Joseph W. Winkels
Alexander S. Rinn
CARLSON, CASPERS, VANDENBURGH,
LINDQUIST AND SCHUMAN, P.A.
225 South Sixth Street, Suite 4200
Minneapolis, MN 55402
Telephone: (612) 436-9600
Facsimile: (612) 436-9605

*Counsel for Plaintiff-Appellee*
*Exmark Manufacturing Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of October, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on all counsel of record by electronic delivery.

*/s/ J. Derek Vandenburgh*
J. Derek Vandenburgh

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C); Fed. R. App. P., I certify that this brief complies with the type-volume limitation of Rule 32(a)(7)(B), Fed. R. App. P. This brief contains 13,983 words, calculated by the word processing system used in its preparation.

Dated: October 28, 2016

*/s/ J. Derek Vandenburgh*
J. Derek Vandenburgh